UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HILMER SCHOENBAUM, | ) | |
| on behalf of himself and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV01108 ERW |
| | ) | |
| E.I. DUPONT DE NEMOURS AND | ) | |
| COMPANY, PIONEER HI-BRED | ) | |
| INTERNATIONAL, INC., and | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter comes before the Court on Defendants E.I. DuPont De Numours and

Company; Pioneer Hi-Bred International, Inc.; and Monsanto Company's Joint Motion to Dismiss

[doc. #138].

## I.    BACKGROUND FACTS

Defendant Monsanto Company develops, manufacturers, licenses, and sells agricultural

biotechnology, agricultural chemicals, and other agricultural products.  Monsanto developed plant

biotechnology that enabled the creation of genetically improved crops by transferring into crop

seed one or more genes that give the resulting plants various favorable traits.  One type of

genetically modified crop seed marketed by Monsanto is Roundup Ready® corn and soybean

seed, which is resistant to glyphosate-based herbicides, such as Monsanto's Roundup® brand

herbicide.  One other genetically modified crop seed is Monsanto's YieldGard® corn seed, which

is resistant to certain pests and insects.  Monsanto holds the patent on these technologies.

Monsanto sells its patented technology to seed producers, including Defendants E.I. DuPont de Nemours and Company ("Defendant DuPont" or "DuPont") and Pioneer Hi-Bred International, Inc. ("Defendant Pioneer" or "Pioneer"), under a license to use the gene technology to create certain genetically-modified soybean and corn seeds. The seed producers then sell the seed developed with Monsanto's technology to retailers or growers, both of whom must obtain licenses from Monsanto before using the seed with the technology.

In March 2004, Plaintiffs, certain individual farmers and farming entities,[1] filed thirteen respective state court class actions against Defendants Monsanto, Pioneer, and DuPont (collectively, "Defendants"). These class actions were filed in Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee, and Wisconsin. The parties agreed to transfer the cases to the Eastern District of Missouri and on December 20, 2005, this Court granted the parties' joint motion to consolidate the cases. In the 419-page consolidated amended complaint, Plaintiffs allege the factual basis for different damages claims against Defendants regarding the purchase of several varieties of genetically-modified crop seeds ("GM seeds") manufactured or sold by Defendants during the time period relevant to this action.

According to the complaint, beginning in the early to mid-1990s, and continuing to the present day, Monsanto, aided by its alleged co-conspirators (Defendants Pioneer and DuPont), devised and implemented a scheme to monopolize the GM corn seed and trait markets and the

---

[1] The named Plaintiffs will be referred to collectively as "Plaintiffs," except where a claim or argument only applies to an individual Plaintiff.

broad-spectrum-herbicide-resistant soybean and corn seed and trait markets.[2]  Pls.' Compl. ¶ 65.

Between 1992 and 1996, in furtherance of the scheme to monopolize, Monsanto allegedly entered

into a series of agreements with competing soybean and corn seed manufacturers, wherein

Monsanto licensed the manufacturers to produce GM seeds incorporating Monsanto's patented

traits.  *Id*. at ¶ 72.  Monsanto allegedly imposed the following restrictions on the seed

manufacturers who were granted a license: (1) prohibiting, without Monsanto's permission,

"stacking" Monsanto's seed traits with non-Monsanto genes; (2) prohibiting the use of any

glyphosate-containing herbicide other than Roundup®, or promoting any broad-spectrum

herbicide other than Roundup®; and (3) imposing tying and exclusive dealing arrangements,

consonant with the above requirements and restrictions.[3]  *Id*. at ¶ 67.

The complaint further charges that in or about 1995, Monsanto changed its seed trait

---

[2] In their complaint, Plaintiffs have defined the product market as: (1) GM Broad-Spectrum-Herbicide-Resistant Soybean Seeds; (2) GM Broad-Spectrum-Herbicide-Resistant Corn Seeds; (3) GM European Corn Borer-Resistant Corn Seeds; (4) GM Root Worm-Resistant Corn Seeds; (5) GM Corn Seeds with Stacked Traits; (6) GM Broad-Spectrum Herbicide-Resistant Soybean Seed Traits; (7) GM Broad-Spectrum Herbicide Resistant Corn Seed Traits; (8) GM European Corn Borer-Resistant Corn Seed Traits; and (9) GM Root Worm-Resistant Corn Seed Traits.

[3] Plaintiffs claim that in April 1992, Monsanto entered into an agreement with a competing seed manufacturer, Defendant Pioneer, to insert Monsanto's Roundup Ready® genes into five of its soybean varietal seed lines.  Plaintiffs claim that in return, Defendant Pioneer agreed to promote only Roundup® herbicide for use with Roundup Ready® soybeans, and to produce and sell unlimited units of Pioneer soybeans containing the Roundup Ready® trait.  Plaintiffs claim that at or about the same time, Monsanto entered into a parallel agreement with Novartis (nka Syngenta).  *Id*. at ¶ 71.

Plaintiffs further claim that between 1992 and 1996, Monsanto entered into license agreements with various seed manufacturers, including Pioneer and Novartis, granting those companies licensed access to Monsanto's GM *Bt* corn seed technology.  Plaintiff claims that, similar to the 1992 agreements, the license agreements allowed Pioneer and Novartis, in exchange for a flat, up-front payment to Monsanto, to incorporate Monsanto's *Bt* corn traits into their seed lines.  *Id*. at ¶ 72.

licensing and marketing model and instituted its "value capture program." *Id*. at ¶ 73. Under this

program, Monsanto allegedly charged a premium on all GM seeds containing Monsanto's traits,

rather than requiring a flat up-front payment. *Id*. Monsanto also allegedly mandated seed

companies to:

> (a) require farmers- including Plaintiffs and the other members of the Classes- to sign grower licensing agreements with Monsanto that forbade them from replanting seeds saved from one year's harvest in a subsequent year;
>
> (b) charge a fixed technology fee - set by Monsanto - on each bag of genetically-modified seeds they sold, incorporating the technology fee into the final price of each bag of seed that they sold; and
>
> (c) collect those technology fees from growers, including Plaintiffs and the other members of the Classes, as part of the price they paid for those seeds, and remit those fees to Monsanto on terms agreed to between Monsanto and its competitors, including Pioneer.

*Id*. at ¶ 75. Thus, according to the complaint, the premium Monsanto charged included a

technology fee, which was dictated by Monsanto to its competitors, including Defendants Pioneer

and DuPont, and was incorporated into the final seed price paid by Plaintiffs and other members

of the Classes.[4] *Id*. at ¶ 76. The complaint further alleges that, under the value capture program,

Monsanto required farmers to execute a Technology Agreement, in order to purchase and use

Monsanto's patented genes. *Id*. at ¶ 82. The complaint also alleges that, pursuant to the

Technology Agreement, they were required to pay the above mentioned "technology fee" directly

---

[4] Plaintiffs claim that from the time of Monsanto's institution of the technology fee, through the 2001 crop year, the technology fee appeared as a separate, line-item invoiced listing on farmers' seed bills. *Id*. at ¶ 80. Beginning in the 2002 crop year, however, Plaintiffs claim Monsanto ordered its licensees to discontinue the practice of invoicing the technology fee as a separate line-item. *Id*. at ¶¶ 80-81. Plaintiffs claim that Monsanto now penalizes companies if they separately list the technology fee on their seed invoices, by, among other things, reducing the upstream technology fee payment split, in which Plaintiffs claim Monsanto engages with the seed manufacturers. *Id*. at ¶ 81.

to Monsanto. *Id.*

The complaint alleges that the "value capture program" enabled Monsanto to gain control over all material aspects of the markets for genetically-modified seeds and seed traits. *Id.* at ¶ 73. Monsanto's seed company licensees allegedly agreed to relinquish their right to competitively determine what premium, if any, they charge for genetically-modified seeds. *Id.* at ¶ 78. Monsanto, in return, granted each licensee a share of the profits resulting from Monsanto's alleged anti-competitive practices, including a share of the technology fee itself. *Id.*

As further evidence of Monsanto's intent to monopolize the genetically-modified seed markets, the complaint refers to Monsanto's "Maize Protection Business Plan" ("the Protection Plan"), authored in 1996. *Id.* at ¶ 101. The complaint alleges that the Protection Plan outlines Monsanto's strategy to monopolize and restrain trade through licensing its genetically modified soybean and corn seed traits to independent seed companies, such as Pioneer and DuPont, that competed both with Monsanto and with each other. *Id.* The complaint quotes the following statements in the Protection Plan:

> Monsanto should enter into commercial agreements with the maize [corn] seed companies that comprise 90% of the sales in the USA hybrid maize seed market.
>
> If we can secure 90% of the distribution, it will be difficult for our competitors to gain significant share long term.
>
> It will be more difficult for other suppliers of traits to demand dollars and expect gene switching when seed companies are already paying Monsanto....
>
> Patents for Roundup Ready® genes have been issued. Using these patents and agreements with maize seed companies, Monsanto can prevent the use of any other glyphosate product in-crop [a.k.a. competitive alternatives to Monsanto's Roundup Ready® seed products and traits] to corn.

*Id*. at ¶ 104 (citing Protection Plan at 12-13).

The complaint further alleges that the Protection Plan explained the means by which Defendants could fix prices of the seeds at issue and divide up the additional revenue gained among Monsanto and its alleged coconspirators:

> A grower agreement is a license with the grower that allows the grower use of the gene technology. In return, the grower pays a "tech fee" along with the price of the maize seed. The tech fee will be set by Monsanto and will be listed on the maize seed sale invoice.... It will be collected by the seed companies. It will be negotiated as to how Monsanto and the seed companies will split the tech fee. The major advantage of the grower license approach is that Monsanto can regulate the price being charged to the end user.... The revenue generated from the traits can be set by Monsanto as opposed to being entirely at the mercy of the seed company pricing decisions.

*Id*. at ¶ 105.

The complaint charges that between 1995 and 1999, Monsanto and Defendant Pioneer met and entered into collusive, anti-competitive agreements that had the effect and purpose of allowing Defendants to set artificially high list prices for the genetically-modified corn and soybean seeds at issue. *Id*. at ¶¶ 108-111. Plaintiffs claim Monsanto persuaded Pioneer to artificially elevate its list prices for the seeds and to implement Monsanto's technology fee or premium charges – to which Pioneer was not subject under its previously-existing license agreements with Monsanto. *Id*. at ¶ 113.

Defendant DuPont then allegedly acquired Defendant Pioneer and subsequently ceased developing and marketing its Synchrony-Treated Soybeans ("STS") - a genetically modified, broad-spectrum-herbicide-resistant soybean seed product that competed with Monsanto's broad-spectrum-herbicide-resistant Roundup Ready® soybean seed trait. *Id*. at ¶ 115. Plaintiffs claim that, over a seven-year period, starting in 1997, DuPont's STS soybean seed market share

decreased from 10% to 1.5%, while Monsanto's Roundup Ready® soybeans acquired close to a 100% market share. Defendants Pioneer and DuPont allegedly distributed Monsanto's seeds and traits and received a portion of the technology fee imposed on Plaintiffs. *Id*. at ¶ 116.

The complaint alleges that in a further effort to prevent competition in the genetically-modified soybean seed market, Monsanto also entered into an agreement with AgrEvo (the corporate predecessor of Aventis CropScience USA Holding, Inc.) to prevent AgrEvo's LibertyLink soybean seeds (which competed with Monsanto's Roundup Ready® soybean seeds) from gaining market viability. *Id*. at ¶ 117. AgrEvo allegedly obtained all necessary regulatory approvals for marketing Liberty Link soybean seeds in the United States and planned to launch the product in 1999. *Id*. However, according to Plaintiffs, as a result of the collusion with Monsanto, AgrEvo never launched its product in the United States. *Id*.

According to the complaint, since 1996, Monsanto has acquired, merged with, or obtained an interest in both gene technology companies and seed companies for the purpose of consolidating and controlling the genetically-modified seed and seed trait markets.[5] *Id*. at ¶ 119. The complaint states that during the same time period, DuPont acquired, merged with or obtained an interest in four additional competitors.[6] *Id*. at ¶ 120.

_____

[5] Plaintiffs claim Monsanto has acquired, merged with, or obtained an interest in: DeKalb Genetics Corp. (partial acquisition in 1996, full acquisition in 1998); Calgene LLC (1997); Asgrow Seed Co., LLC (1996); First Line Seeds Ltd. (1998); Holden's Foundation Seeds (1997); Plant Breeding International (1999); Cargill, Inc.'s international seed business (1998); Agracetus (1996); Ecogen Inc. (1996); Maharashtra Hybrid Seeds Co. Ltd. (1998); Channel Bio Corp. (2004); NC+ Hybrids Inc. (2005); Seminis Inc. (2005); Emergent Genetics, Inc. (2005); Fontanelle Hybrids (2005); Steward Seeds (2005); Trelay Seeds (2005); Stone Seeds (2005); Specialty Hybrids (2005); Gold Country Seed Inc. (2006); and Heritage Seeds (2006). *Id*.

[6] Plaintiffs claim DuPont acquired, merged with, or obtained an interest in: Pioneer (1999); Protein Technologies, Inc. (1998); Hybrinova SA (1998); and Agar Cross SA (1999). *Id*.

The complaint concludes that as a result of Defendants' conduct, the genetically modified soybean and corn seed and seed trait markets can now be characterized as follows:

> (a) the number of companies engaged in the creation, distribution, and marketing of seeds has diminished substantially to the point where Monsanto itself and through its [alleged] coconspirators, (including Defendants Pioneer and DuPont), now controls almost all production, marketing and sale of genetically-modified soybean and corn seeds and/or seed traits;

> (b) Monsanto asserts virtually 100% control over the genetically-modified, broad-spectrum-herbicide-resistant soybean and corn seed and/or trait markets and over 85% of the genetically modified *Bt* corn seed and/or trait markets

> (c) competition in the genetically-modified soybean and corn seed and/or trait markets has been suppressed, if not nearly eliminated;

> (d) the price of genetically-modified seeds has been raised, fixed, or stabilized, through, *inter alia*, restrictive and anticompetitive licensing and/or other arrangements and the imposition of technology fees and seed premiums as fixed components of seed prices paid by Plaintiffs and the other members of the Classes; and

> (e) barriers to entry for new genetically-modified seed traits have markedly increased while the incentives to overcome those barriers have decreased due to the anticompetitive conduct of Monsanto and its co-conspirators, including Defendants Pioneer and DuPont.

Id. at ¶ 136.

### Counts One - Four

Counts 1-4, brought by the Nationwide RICO Roundup Ready® Soybean Seed Purchaser Class or the Nationwide RICO Genetically-Modified Corn Seed Purchaser Class, allege that Defendant Monsanto knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the conduct of the seed manufacturers who license Monsanto's GM seed technology, and continues to do so, through a pattern of racketeering activity, including multiple predicate acts chargeable under 18 U.S.C. § 2314 (transporting stolen or converted money) and 18 U.S.C.

§ 2315 (receiving stolen or converted money), in violation of The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). Plaintiffs seek damages, costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c) and equitable relief, pursuant to 18 U.S.C. § 1964(a).

### Counts Five - Twenty-Four[7]

Counts 5-24 allege that Defendants Monsanto, Pioneer and DuPont have violated the Sherman Antitrust Act, 15 U.S.C. §2, by monopolizing, attempting to monopolize and conspiring to monopolize the GM corn seed and soybean seed markets and that Defendants have conspired to fix, raise, maintain or stabilize the prices of the GM seeds, in violation of §1 of the Sherman Act, 15 U.S.C. §1. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Twenty-Five - Twenty-Eight

Counts 25-28, brought by the Illinois Roundup Ready® Soybean Seed Purchaser Class or the Illinois Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/1 *et seq.* (2007), and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Twenty-Nine - Thirty-Six

Counts 29-36, brought by the Indiana Roundup Ready® Soybean Seed Purchaser Class or the Indiana Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Indiana Antitrust Act, Ind. Code. § 24-1-2-1 *et seq.*

---

[7] Counts 5-25 are brought by the respective Statewide Classes.

(2007), of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1, *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

## Counts Thirty-Seven - Forty-Two

Counts 37-42, brought by the Iowa Roundup Ready® Soybean Seed Purchaser Class or the Iowa Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Iowa Competition Law, Iowa Code. § 553.1 *et seq.* (2006) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

## Counts Forty-Three - Fifty

Counts 43-50, brought by the Kansas Roundup Ready® Soybean Seed Purchaser Class or the Kansas Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* (2006), of the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 *et seq.* (2006) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

## Counts Fifty-One - Fifty-Six

Counts 51-56, brought by the Michigan Roundup Ready® Soybean Seed Purchaser Class or the Michigan Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Michigan Antitrust Reform Act, Mich. Comp. Laws. Serv., § 445.771 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Fifty-Seven - Sixty-Six

Counts 57-66, brought by the Minnesota Roundup Ready® Soybean Seed Purchaser Class or the Minnesota Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49 *et seq.* (2006), of the Minnesota Consumer Protection Act, Minn Stat. § 325F.68 *et seq.* (2006) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Sixty-Seven - Seventy-Two

Counts 67-72, brought by the Missouri Roundup Ready® Soybean Seed Purchaser Class or the Missouri Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.011 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Seventy-Three - Eighty-Four

Counts 73-84, brought by the Nebraska Roundup Ready® Soybean Seed Purchaser Class or the Nebraska Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Nebraska Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 *et seq.* (2007), of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601 *et seq.* (2007),of the Nebraska Uniform Deceptive Trade Practices Act § 87-301 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Eighty-Five - Ninety-Two

Counts 85-92, brought by the North Dakota Roundup Ready® Soybean Seed Purchaser Class or the North Dakota Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code. § 51-08.1-01 *et seq.* (2007), of the North Dakota Consumer Fraud Act, N.D. Cent. Code § 51-15-01 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Ninety-Three - Ninety-Eight

Counts 93-98, brought by the Ohio Roundup Ready® Soybean Seed Purchaser Class or the Ohio Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Ohio Valentine Act, Ohio Rev. Code. Ann. § 1331.01 *et seq.* (2007), and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts Nighty-Nine - One Hundred Six

Counts 99-106, brought by the South Dakota Roundup Ready® Soybean Seed Purchaser Class or the South Dakota Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the South Dakota Restraint of Trade, Monopolies and Discriminatory Trade Practices Statute, South Dakota Codified Laws § 37-1-3.1 *et seq.* (2007), of the South Dakota Consumer Protection Act, South Dakota Codified Laws § 37-24-1 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts One Hundred Seven - One Hundred Twelve

Counts 107-112, brought by the Tennessee Roundup Ready® Soybean Seed Purchaser

Class or the Tennessee Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of the Tennessee Trade Practices Act, Tenn. Code. Ann. § 47-25-101 *et seq.* (2007) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

### Counts One Hundred Thirteen - One Hundred Seventeen

Counts 113-117, brought by the Wisconsin Roundup Ready® Soybean Seed Purchaser Class or the Wisconsin Genetically-Modified Corn Seed Purchaser Class, against Defendants Monsanto, Pioneer and DuPont, allege violations of Wisconsin Antitrust law, Wis. Stat. § 133.01 *et seq.* (2006) and common law unjust enrichment. Plaintiffs seek declaratory and injunctive relief, as well as damages and attorneys' fees.

In response to Plaintiffs' Complaint, Defendants filed a motion to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

## II. MOTION TO DISMISS STANDARD

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, the Court must take all facts alleged in the complaint to be true and must construe the pleadings in the light most favorable to Plaintiff. *Gregory v. Dillard's*, 2007 WL 2067853, *14 (8th Cir. July 20, 2007). The Federal Rules do not require great precision in pleadings. *Id.* at *15. "The 'simplified notice pleading standard' under Fed. R. Civ. P. 8(a) requires only a statement that 'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds)) (alterations in original); *see also Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007)

("The statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." (Internal citation and alteration omitted)). "Specific facts are not necessary. ..." *Erickson*, 127 S.Ct. at 2200. However, the factual allegations in the complaint must be more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007); *see also Gregory*, 2007 WL 2067853 at *15. "It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." *Twombly*, 127 S.Ct. at 1966-67 (internal citations omitted). "A district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967 (internal citations and quotations omitted).

## III.    DISCUSSION[8]

---

[8]In the Motion, Defendants argue that Plaintiffs' claims are time-barred and therefore should be dismissed. According to Defendants, the following cases contain similar allegations to those asserted here: *Higginbotham v. Monsanto Co.*, No. 1:99CV03337, (D.D.C., December 14, 1999); *Blades v. Monsanto Co.*, No. 00-CV-4034, (S.D. Ill. February 14, 2000); and *Sample v. Monsanto Co.*, No. 4:01-CV-00065, (E.D. Mo., February 14, 2000) (collectively, "*McIntosh* "). Defendants argue that the claims in this consolidated action accrued - at the latest - by December 1999, because the first *McIntosh* case should have alerted Plaintiffs to their injuries. Defendants maintain therefore, that Plaintiffs' March, 2004, filing of this action is outside the four year statute of limitations period, applicable to antitrust claims. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971) (internal quotations omitted) ("Damages are recoverable under the federal antitrust acts only if suit therefor is commenced within four years after the cause of action accrued, under 15 U.S.C.S. § 15(b), plus any additional number of years during which the statute of limitations was tolled.").

Plaintiffs counter that if, as Defendants contend, the *McIntosh* cases contain allegations similar to those asserted here, the motion for class certification filed in *Sample*, tolled the running of the statute of limitations, at least, through the court's September 23, 2003, denial of the motion. Plaintiffs point out that the proposed class members in *Sample* are the same parties that have filed suit here and therefore, the action before this Court is timely.

In *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the Supreme Court held that the filing of a putative class action "tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate

## A.    Federal Antitrust Claims

Plaintiffs allege that Defendants entered into unlawful agreements in restraint of trade, in

an attempt to fix the price of GM corn and soybean seeds and traits and to aid Defendant

Monsanto in its efforts to monopolize the market for GM corn and soybean seeds, in violation of

Sections 1 and 2 of the Sherman Act.  In opposing Plaintiffs' claims, Defendants first argue that

Plaintiffs lack standing to bring their federal antitrust claims.  Defendant Monsanto next argues

that Plaintiffs' claims fail on their merits because it is immune from attack under the antitrust laws.

It argues that as the holder of valid patents on the traits at issue, it has the right to fix the price of

the GM corn and soybean seeds and specify the prices it charges for its patented technology and

the terms under which its technology may be used.  Defendant Monsanto thus maintains that its

licensing approach is neither monopolistic nor an improper restraint on trade.

The Court first observes that Defendant Monsanto has filed patent infringement lawsuits

--------

for class action status." *Id*. at 553.  The Court concludes that the *American Pipe* tolling rule is
appropriate in this case.  The proposed classes in the motion for class certification in *Sample*
were all persons and entities who purchased Roundup Ready® soybean seeds in the United States
and all persons and entities who purchased Yieldgard® corn seeds in the United States.  Plaintiffs'
here were within the class sought in *Sample*.  Thus, the statute of limitations period was tolled on
their claims, while the *Sample* court determined whether to allow the case to proceed as a class
action.

Defendants' reliance on *Basch v. Ground Round, Inc.*, 139 F.3d 6, 11 (1st Cir. 1998), in
support of the proposition that Plaintiffs' claims were not tolled because *American Pipe* does not
extend to subsequent class actions, is misplaced.  In *Basch*, the court ruled that Plaintiffs were not
permitted to toll the statute of limitations by filing successive putative class actions, alleging
similar classes and similar claims.  *Id*. at 11; *see also Korwek v. Hunt*, 827 F.2d 874, 879 (2d Cir.
1987) ("The Supreme Court in *American Pipe* ... certainly did not intend to afford plaintiffs the
opportunity to argue and reargue the question of class certification by filing new but repetitive
complaints.").  Here, Plaintiffs have not attempted to file a successive class action by members of
the original asserted class nor seek to relitigate the propriety of a previously rejected class.
Therefore, the Court concludes that *Basch* and *Korwek* are distinguishable and Plaintiffs' claims
are not time-barred.

against farmers for alleged infringement on Monsanto's patents. In response, the defendant farmers typically file counterclaims alleging, among other things, Sherman Act antitrust violations. Courts considering the issue have held generally that the technology fee payments required by Monsanto's licensing agreements with seed growers, restrictions stipulated in the licensing agreements and restrictions on seed growers' use of the seed incorporating Monsanto's traits, are within the scope of Monsanto's patent rights and therefore do not violate antitrust law.

Two cases from the Federal Circuit Court of Appeals are illustrative. In *Monsanto v. McFarling*, 302 F.3d 1291(Fed. Cir. 2002) ("*McFarling I*"), the defendant challenged Monsanto's prohibition against saving its patented seeds for planting the next season on the ground that such a prohibition constituted an illegal restraint of trade, in violation of the Sherman Act. The Federal Circuit disagreed, holding that the restriction in the Technology Agreement the defendant executed, was within the scope of the patent grant because the patent read on all generations of the seeds. *Id*. at 1298-99. The court further reasoned that there was no evidence in the record to support the theory that the defendant was required to buy future patented seeds from Monsanto in order to buy present patented seeds, *id*. at 1298, and, therefore, "it was unlikely that an antitrust violation would be found." *Id*. at 1299; *see also Monsanto Co. v. McFarling*, 363 F.3d 1336, 1343 (Fed. Cir. 2004) ("*McFarling II*") (affirming the district court's dismissal of Defendant's antitrust counterclaim because "the restrictions in the Technology Agreement prohibiting the replanting of the second generation of ROUNDUP READY (R) soybeans do not extend Monsanto's rights under the patent statute").

In *Monsanto Co. v. Scruggs*, 459 F.3d 1328 (Fed. Cir. 2006), a patent infringement case, the defendant filed counterclaims against Monsanto, asserting, among other things, that Monsanto

violated §§ 1 and 2 of the Sherman Act by tying the purchase of seed to the purchase of Roundup® herbicide, through grower license agreements, grower incentive agreements and seed partner license agreements.[9]  The defendant also asserted that the technology fee payments required by Monsanto's licensing agreements with seed growers are illegal anticompetitive practices.  *Id.* at 1340.

The appeals court rejected these arguments.  The court found that (1) the technology fee imposed by Monsanto "is essentially a royalty fee," the charging of which is within the scope of the patent grant; (2) the Roundup herbicide restriction did not constitute illegal tying because Roundup® was the only EPA approved product for use over the top of the Roundup® seeds from 1996 to 1998, and only the licenses taken out during those years had the Roundup® herbicide restriction; and (3) the grower incentive agreements are legal restraints because they simply give growers an incentive to choose Roundup® herbicide and do not coerce them into purchasing it.  *Id.*

Other courts have also considered whether Monsanto's practices, with respect to its patented gene technology, violate antitrust law.  The district court in *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 575 (N.D. Miss. 2004), considered the defendant's argument that Monsanto's refusal to license its soybean seed partners to stack the Roundup Ready® trait with transgenic traits is a violation of the Sherman Act.  The court held that these restrictions are "clearly field of use restrictions which fall within the scope of the patent monopoly and are, therefore, lawful."  *Id.* (citing *B. Braun Medical Inc. v. Abbott Laboratories*, 124 F.3d 1419,1426

---

[9] "A tying arrangement is the sale or lease of one product on the condition that the buyer or lessee purchase a second product."  *Breaux Bros. Farms, Inc. v. Teche Sugar Co., Inc.*, 21 F.3d 83, 86 (5th Cir. 1994).

(Fed. Cir. 1997)).[10]

Defendants point to the above decisions in support of their proposition that their conduct at issue is not unlawful antitrust activity. In response, Plaintiffs acknowledge that Monsanto enjoys certain rights under its patents, but argue that Monsanto has used its otherwise lawful licenses to engage in an illegal scheme with Defendants Pioneer and DuPont to regulate the distribution and fix the prices of its patented GM Seeds, in violation of Section 1 of the Sherman Act. Plaintiffs further contend Defendants conspired to restrain trade and eliminate competition in the GM seed market in order to raise Monsanto's market shares in six years from 11% to 100% in the GM soybean market and to 90% in the GM corn market, in violation of Section 2 of the Sherman Act. In support of their argument, Plaintiffs claim that Defendants Pioneer and DuPont stopped making or developing competing GM seed products in order to share in Monsanto's resulting supracompetitive monopoly profits. Plaintiffs also claim that Monsanto illegally induced other seed manufacturers not to compete, and acquired numerous other firms to eliminate competition.

For the reasons that follow, the Court believes that Plaintiffs have alleged sufficient facts to overcome Defendants' motion to dismiss on the issue of whether Defendant Monsanto's license agreements with Defendants DuPont and Pioneer had the effect and purpose of unlawfully

---

[10] In this case, Plaintiffs' complaint charges that "[t]he license agreements between Monsanto and its co-conspirators further assert control and dominion over the genetically-modified seed market by prohibiting the 'stacking' of, inter alia, genetically modified Bt corn traits and genetically-modified, broad-spectrum-herbicide-resistant soybean and corn traits with other traits. For example, this license term prevented licensees from utilizing other genetically-modified seed technologies in combination with Roundup Ready® or YieldGard®. Such prohibitions have raised the barriers to entry to the market for genetically modified seed products, thereby further reducing competition in those markets." Pls.' Compl. at ¶ 96.

restraining trade and allowing Monsanto to unlawfully maintain a monopoly over the relevant markets.

### 1.    Standing

The parties dispute whether Plaintiffs have standing to sue under §§ 1 and 2 of the Sherman Act.  The Supreme Court of the United States, construing § 4 of the Sherman Act, has held that an indirect purchaser lacks standing to seek damages relief against the manufacturer for alleged violations of federal antitrust laws.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 492-93 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728-29 (1977).[11]  Those who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries.  *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006) (citing *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 207 (1990)).  The question of whether Plaintiffs are direct or indirect purchasers of the GM seeds and traits at issue, that is, whether Plaintiffs purchased the seeds directly from Monsanto or whether they purchased the seeds from an intermediary, is vigorously disputed by the parties.

Trying to follow and reconcile Plaintiffs' statement of uncontroverted facts, inconsistent statements of counsel and briefing arguments in allowing Plaintiffs to proceed further with this

---

[11] The Court relied on three rationales in adopting the indirect purchaser rule: 1) establishing the amount of an overcharge shifted to indirect purchasers would normally prove insurmountable in light of the wide range of considerations influencing a company's pricing decisions; 2) a pass-on defense would reduce the effectiveness of §4 actions by diminishing the recovery available to any potential plaintiff; and 3) allowing suits by indirect purchasers would risk multiple liability because the alleged antitrust violators could not use a pass-on defense in an action by the direct purchasers.  *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 206-08 (1990). The Supreme Court has applied the indirect purchaser rule to cases involving § 1 of the Sherman Act, *see Illinois Brick*, 431 U.S. at 728-29, and § 2 of the Sherman Act, *see Hanover Shoe*, 392 U.S. at 492-94.

litigation is perplexing. All of the parties are aware that indirect purchasers cannot successfully maintain antitrust claims. In this action, when the motion was filed for appointment of class counsel, the putative class defined in the thirteen complaints included allegations only to plaintiffs as indirect purchasers. Shortly thereafter, Defendants filed a motion to dismiss alleging lack of antitrust standing by Plaintiffs as indirect purchasers. Plaintiffs thereafter moved to amend their complaints to allege that they were direct *and/or* indirect purchasers of "seeds and/or seed traits." On May 24, 2006, this Court held a hearing to address, among other things, whether Plaintiffs can characterize the class members as direct purchasers in light of Plaintiff's confession in its Statement of Uncontroverted Material Facts in *Monsanto v. Baumgardner*, 4:04CV00708 ERW (E.D. Mo. 2005), where Plaintiffs unquestionably stated:

> Farmers are barred under Missouri law from bringing state antitrust claims against Monsanto in Missouri state courts because they did not purchase Roundup Ready® soybean seed or YieldGuard® corn seed directly from Monsanto.[12]

In the *Baumgardner* action before this Court, Plaintiffs unequivocally presented themselves as indirect purchasers of corn and soybean seed from Monsanto. Plaintiffs' counsel unequivocally stated, in response to the Court's question:

> These new complaints -- one of the things they do do with respect to the allegations is make very clear the division between the trait and the seed. That's an important distinction. Farmers are direct purchasers of the trait, which belongs to Monsanto. They buy seed from Pioneer and its other alleged co-conspirators. Whether or not the *Baumgardner* undisputed statement of facts or whatever it was called said that they were indirect purchasers, they were, indeed, indirect purchasers of seed. They were not indirect purchasers of trait.

(May 24, 2006 Tr. P.22 L.6-15).

---

[12] *See* Defendant Farmers' Uncontroverted Material Facts in cross-motion for summary judgment no. 11.

Counsel's statement, "whether or not the *Baumgardner* undisputed statement of facts or whatever it was called . . ." is not reassuring to the Court. Plaintiffs did in fact make that statement in the *Baumgardner* case with the intent that the Court rely on it. These cases are enormously expensive to the parties and present demanding time management issues to the Court. In subsequent statements to the Court at the same hearing, there are clear signals that Plaintiffs are unwilling to commit to their status as purchasers. The Court tried to determine if Plaintiffs, in separating themselves as purchasers for one purpose and not for another, were willing to confess what they were <u>not</u> claiming as indirect purchasers. The Court asked:

> In any event, you're indirect purchasers only as to the germplasm, correct?
> Counsel answered. No. We're indirect purchasers as to what part of the seed is
> owned by Monsanto that makes them direct purchasers as against Monsanto.

This recitation did not clear the issue to the Court's satisfaction. It seems only logical, that at this stage of the protracted litigation, Plaintiffs could clearly state in unequivocal terms, their status as purchasers of Monsanto's products.

In Plaintiffs' opposition brief to Defendants' motion to dismiss, Plaintiffs claim that Defendants misconstrue the nature of Plaintiffs' direct purchaser claim. At page 23 of their brief, Plaintiffs state, "[p]laintiffs assert in the first instance that they are direct purchasers of genetically-modified *seeds,* not genetic traits." This is inconsistent with Plaintiffs' position where, in answer to a Court's question, Plaintiffs' counsel said, "[f]armers are direct purchasers of the trait." In any event, "in the first instance," when this Court was called on to make rulings in the *Baumgardner* case, individual plaintiffs represented:

> **Farmers' Uncontroverted Fact Statement No. 11:** Farmers are barred under
> Missouri law from bringing state antitrust claims against Monsanto in Missouri
> state courts because they did not purchase Roundup Ready® soybean seed or

YieldGard® corn seed directly from Monsanto. Farmers' Mem., *passim*.

In footnote 12, after stating that they were asserting in the first instance that they are direct purchasers of genetically-modified *seeds,* not genetic traits, Plaintiffs state, "[a]lthough Plaintiffs do contend in the *alternative* that they are also direct purchasers of traits, the central thrust of Plaintiffs' position is that they are direct purchasers of seeds. Defendants' failure to focus on the correct issue flaws their analysis."

The Court's earlier question of whether Plaintiffs should be precluded from proceeding on a claim of being direct purchasers when it was represented to the Court as an uncontroverted fact that the farmers were not direct purchasers, remains unanswered by Plaintiffs. The Court cannot agree that there is a failure of Defendants to focus on the correct issue. The correct issue is whether Plaintiffs are direct or indirect purchasers. If they are indirect purchasers their antitrust claims cannot go forward.

Defendants urge the Court to invoke the doctrine of judicial estoppel to prevent Plaintiffs from asserting inconsistent theories. The equitable doctrine of judicial estoppel provides that, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hamsphire v. Maine*, 532 U.S. 742, 749 (2001). A litigant who asserts judicial estoppel must establish that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding; (2) the prior inconsistent position was adopted by the first court in some manner; and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the

opposing party if not estopped. *Id.* at 750-51. The doctrine is limited to situations where the risk of inconsistent results with its impact on judicial integrity is certain. *Id.*

The Court acknowledges that Plaintiffs have presented multiple legal theories, on multiple occasions, with respect to their status as direct or indirect purchasers. The Court will reserve its ruling on the issue of judicial estoppel at this time. It is yet to be decided whether Plaintiffs can avoid dismissal in subsequent proceedings on this and other bases.

The Court concludes, on the issue of standing, that at this stage of the proceedings, it cannot make a determination on dismissal until the facts are further developed. *See Blades v. Monsanto Co.*, 400 F.3d 562, 568 n.4 (8th Cir. 2005). Furthermore, for purposes of a motion to dismiss, the Court is required to accept Plaintiffs' allegations as true. *See Twombly*, 127 S.Ct. at 1965. Thus, while the Court is aware that this issue remains disputed between the parties, at this stage of the litigation, the Court will assume without deciding, as Plaintiffs contend in their complaint, that they were direct purchasers of Defendant Monsanto's GM seeds or, in the alternative, direct purchasers of Defendant Monsanto's GM traits. To the extent Plaintiffs make antitrust claims against any Defendant as indirect purchasers of either germplasm or any genetic trait[13] associated therewith, those claims will be dismissed.[14]

### 2. Section 1 of the Sherman Act

Section 1 of the Sherman Act is violated when two or more entities contract, combine, or

---

[13] The Court, in making this ruling, by no means is suggesting that it has concluded that the components of the seed are divisible for maintenance of any claim in this litigation.

[14] See footnote 23. The States of Iowa, Kansas, Michigan, Minnesota, Nebraska, North Dakota, South Dakota, Tennessee and Wisconsin by their statutes may bring state antitrust claims as indirect purchasers.

conspire to unreasonably restrain trade or commerce. *TV Signal Co. v. American Tel. & Tel. Co.*, 462 F.2d 1256, (8th Cir. 1972); 15 U.S.C. § 1.[15]  To state an antitrust claim, Plaintiffs must sufficiently allege anticompetitive conduct and injury to the plaintiff "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.*, 429 U.S. 477, 489 (1977).  Accordingly, Plaintiffs here must sufficiently allege that the challenged conduct was an unreasonable restraint of trade that caused injury to Plaintiffs.

Plaintiffs allege that Monsanto, Pioneer and DuPont were parties to an "agreement" or "conspiracy" to fix the price of the GM seeds at issue.  Plaintiffs claim that between 1995 and 1999, Monsanto entered into restrictive licensing and exclusive dealing agreements with licensees such as Defendants Pioneer and DuPont.  In exchange for a share of Monsanto's supracompetitive profits, Pioneer and DuPont agreed to charge and collect a price-fixed technology fee on each bag of GM seed sold to seed growers, to surrender their rights to competitively determine their own seed prices and to stop engineering and manufacturing products that would compete with Monsanto's GM seeds.  Plaintiffs note that Pioneer and DuPont were not previously required to implement technology fees under its previously-existing license agreements with Monsanto.  Plaintiffs allege that competition in the relevant market was eliminated by the profit-sharing agreements executed by Defendants and that these cash payments amount to an unreasonable restraint of trade.  Plaintiffs further allege that in 1997 and 1998, Pioneer agreed to further price-fixing arrangements with Monsanto; in exchange for obtaining

---

[15]  Section 1 of the Sherman Act, 15 U.S.C. § 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.

new GM seed varietal traits from Monsanto and the technology to make others, Pioneer secretly agreed to charge an "elite" or premium price on GM seeds and further agreed not to compete with Monsanto on pricing for GM seeds.

The Supreme Court has declared that where a patent holder enters into an agreement with competitors to fix the price at which the patented product may be sold, that conduct amounts to an unreasonable restraint of trade. In *United States v. Masonite*, 316 U.S. 265, 278-279 (1942), Masonite, a patent holder on hardboard, entered into *del credere* agency agreements[16] with competitors, which, among other things, specified minimum list prices and maximum terms of sale, set solely by Masonite, to which the competitors were required to adhere. *Id.* at 271. In return, the competitors received commissions for selling the patented product at a fixed price. *Id.* Masonite argued that the competitors were merely agents and any monopoly or restraint that resulted from the agreements was granted by the patents. *Id.* at 276. The Supreme Court disagreed, holding that Masonite entered into the agreements for the purpose of fixing the prices at which the competitors may market its product and therefore the agreements were an enlargement of the limited patent privilege and a *per se* violation of the Sherman Act.[17] *Id.* at

---

[16] A *del credere* agent is defined as "an agent who guarantees the solvency of the third party with whom the agent makes a contract for the principal. A *del credere* agent receives possession of the principal's goods for purpose of sale and guarantees that anyone to whom the agent sells the good on credit will pay promptly for them. For this guaranty, the agency receives a higher commission for sales." Black's Law Dictionary 64 (7th ed. 1999).

[17] The principle of *per se* unreasonableness is that "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. et al., v. United States*, 356 U.S. 1, 5 (1958). Price fixing practices have been deemed illegal *per se* violations of antitrust laws. *Id.*

279-280.

> A patentee who employs a *del credere* agent to distribute his product certainly is not enlarging the scope of his patent privilege if it may fairly be said that that distribution is part of the patentee's own business and operates only to secure to him the reward for his invention which Congress has provided. But where he utilizes the sales organization of another business-a business with which he has no intimate relationship-quite different problems are posed since such a regimentation of a marketing system is peculiarly susceptible to the restraints of trade which the Sherman Act condemns.

*Id*. at 279. The Court further reasoned that price-fixing agreements with competitors "is a powerful inducement to abandon competition;" competitors prefer a mutual arrangement of price fixing, "which promises more profit if the parties abandon rather than maintain competition." *Id*. at 281.

Here, the alleged unlawful conduct, if proved, is similar to the price-fixing agreements in *Masonite*. As discussed above, Plaintiffs claim that Monsanto has entered into licencing and exclusive dealing agreements with competitors, such as Pioneer and DuPont, to fix the price of GM seeds, under specified terms and conditions. Plaintiffs further allege that Monsanto paid its competitors to refrain from marketing competing products. As a result of Defendants' alleged conduct, Plaintiffs claim that they have been forced to pay artificially high prices for GM seeds containing Monsanto's technology.

The Court finds, at this motion to dismiss stage of the case, Defendants' argument that it is simply exercising its rights under its patent grant unavailing. While a patent holder enjoys certain statutory rights, those rights are not unbounded. "Intellectual property rights do not confer a privilege to violate the antitrust laws." *CSU, L.L.C. v. Xerox Corp (In re Indep. Serv. Orgs. Antitrust Litg.)*, 203 F.3d 1322, 1325 (Fed. Cir. 2000). The patent laws permit a patentee

to unilaterally "exact royalties as high as he can negotiate with the leverage of that [patent] monopoly," *Scruggs*, 342 F. Supp. 2d at 575, without offending the antitrust laws. However, if the patentee agrees with his competitors to fix the price of the patented product, then there is an antitrust violation. *See Twombly*, 127 S. Ct. at 1964 (internal citations and quotations omitted) ("Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade ... but only restraints effected by a contract, combination or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express...."); *see also Louisiana Farmers' Protective Union, Inc. v. Great Atlantic & Pacific Tea Co.*, 131 F.2d 419, 422 (8th Cir. 1942) (in finding agreement among competitors to control prices of strawberries unlawful, court noted that "acts in themselves lawful considered alone, if a part of a plan for controlling prices to eliminate competition in interstate commerce," are in direct violation of the Sherman Act).

Thus, construing the allegations in the light most favorable to Plaintiffs, Defendants' actions could be reasonably viewed as having no other purpose than to suppress or eliminate competition and may amount to an unreasonable restraint of trade. *See General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir. 1987) ("Anticompetitive conduct is conduct without a legitimate business purpose that makes sense only because it eliminates competition."); *see also Ciprofloxacin Hydrochloride Antitrust Litig.*, 166 F. Supp. 2d 740, 749-50 (E.D.N.Y. 2001) (finding agreement between generic manufacturer and patent holder of the pioneer drug anticompetitive under antitrust law, whereby the generic manufacturer agreed to refrain from marketing its generic version of the drug, in return for substantial cash payments). The Court concludes that Plaintiffs have sufficiently alleged facts, if proved, that could show

Defendants entered into unlawful agreements in restraint of trade, and thus state a valid § 1 claim. Accordingly, the Court will deny Defendants' motion to dismiss Plaintiffs' § 1 claim.

### 3. Section 2 of the Sherman Act

The complaint alleges three theories of liability under § 2 of the Sherman Act. Plaintiffs assert that Defendants Monsanto, Pioneer and DuPont, monopolized, attempted to monopolize and conspired to monopolize the relevant market for GM corn and soybean seeds in violation of 15 U.S.C. § 2. Defendants move to dismiss Plaintiffs' attempted monopolization claim, asserting that Plaintiffs are users of the seed, not competitors, and therefore lack standing to pursue such a claim. Defendants further argue that Plaintiffs have failed to adequately plead specific intent to monopolize, as an element of their conspiracy to monopolize claim.

### a. Standing to Assert Attempted Monopolization Claim

Section 2 of the Sherman Act prohibits conduct that furthers a monopoly, an attempt to monopolize or a conspiracy to monopolize any part of trade or commerce. 15 U.S.C. § 2.[18] "Attempted monopoly claims are aimed at 'the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it.'" *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007). To state a claim for attempted monopolization, a plaintiff must show: (1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant

---

[18] Section 2 of the Sherman Act, 15 U.S.C. § 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.

directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Id*.

When evaluating the issue of a private plaintiff's antitrust standing, the dispositive inquiry is not, as Defendants suggest, whether the plaintiff is a competitor. Rather, a court considers a number of factors:

> (1) The casual connection between the alleged antitrust violation and the harm to plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust law; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

*McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983). In *Midwest Communications, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985), the Eighth Circuit Court of Appeals instructed that the threshold inquiry, to determine whether a plaintiff has standing to sue under the antitrust laws, must focus on the plaintiff's alleged injury.

> An antitrust injury is one that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause.

*Id*. at 450-51 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Thus, "to have standing to sue under the antitrust laws, the plaintiff must be the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury."

*Midwest Communications*, 779 F.2d at 451.

Because the Court believes that proof may show class Plaintiffs are the target of anticompetitive activity, the Court will deny Defendants' motion.

b. Conspiracy to Monopolize Claim

Defendants contend that Plaintiffs have failed to allege that Defendants had a specific

intent to achieve an unlawful monopoly.[19] To allege a claim for conspiracy to monopolize under § 2 of the Sherman Act, a plaintiff must plead three elements: (1) conspiracy; (2) specific intent to monopolize; and (3) overt acts in furtherance of the conspiracy. *Baxley-Delamar Monuments, Inc. v. American Cemetery Assoc.*, 843 F.2d 1154, 1157 (8th Cir. 1988). The Eighth Circuit has explained, in the context of an attempted monopolization claim, that "specific intent refers not to the defendant's general intent to do a particular act, but to an overall anticompetitive intent expressed through its actions to destroy competition or build monopoly." *General Industries*, 810 F.2d at 802. "Moreover, it must be shown that the defendant's alleged coconspirators ... shared its specific intent to create a monopoly." *Super Turf, Inc., v. Monsanto Co.*, 660 F.2d 1275, 1283 (8th Cir. 1981).

Based upon its review of the complaint, the Court finds that Plaintiffs have adequately alleged that Defendants acted with the requisite intent to monopolize the GM seed market at issue. The complaint charges that, between 1995 and 1999, top executives of Monsanto and Pioneer held meetings and entered into secret agreements, wherein Pioneer acquiesced in Monsanto's scheme for the artificial elevation and fixing of prices of GM seeds as part of Monsanto's overall plan to monopolize those markets. *See* Compl. ¶¶ 108-16. Additionally, the complaint alleges that in furtherance of the scheme DuPont acquired Pioneer and ceased

---

[19] Defendants also move to dismiss Plaintiffs' conspiracy to monopolize claims on the ground that it is economically implausible that DuPont and Pioneer, competing seed manufacturers, would conspire with Monsanto to further its efforts to acquire or maintain a monopoly in the market for seed traits. Plaintiffs respond that DuPont and Pioneer received a portion of the profits acquired as a result of the monopoly and therefore a rational economic motive exists for aiding Monsanto in its efforts to acquire or maintain a monopoly.

Until the facts are developed further, the Court cannot make a determination as to whether any economic motive exists for the alleged agreements and therefore, it is proper to deny Defendants' motion to dismiss on this ground.

manufacturing competing GM soybean seed technology. *Id*.

The Defendants have a long history of fierce litigation against each other, competing not only in litigation but through acquisitions to achieve an advantage in developing and marketing GM products. It is so very unlikely that any of these Defendants would agree in any respect to bestow any benefit upon the other, except through lawful licensing agreements, and then, only when no other course for independent development or acquired rights are potentially available. However, inexplicable it may be, Plaintiffs allege that agreements were made to allow a monopoly to be forged. At this stage of the proceedings, the court must accept these facts as true.

Moreover, "specific intent need not be proven by direct evidence, but can be inferred from the defendant's anticompetitive practices or other proof of unlawful conduct." *General Industries*, 810 F.2d at 802. As discussed in the context of the § 1 claim, Plaintiffs have adequately alleged anticompetitive conduct on the part of Defendants; thus specific intent may be inferred. *Id*. Because Plaintiffs have averred specific intent to monopolize and alleged anticompetitive conduct on the part of Defendants, the motion to dismiss the conspiracy to monopolize claim must be denied.

**B.     RICO Claims**

RICO imposes criminal and civil liability upon those who engage in certain "prohibited activities." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232 (1989). "Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof either of 'a pattern of racketeering activity' or of 'collection of an unlawful debt.'" *Id*. "'Racketeering activity' is defined in RICO to mean 'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses.'" *Id*.

(quoting 18 U.S.C. § 1961(1)). The interstate transportation of stolen property, in violation of the National Stolen Property Act ("NSPA"), is a form of racketeering activity for purposes of RICO. 18 U.S.C. § 1961(1)(B). In support of their RICO claims, Plaintiffs allege violations of the NSPA, 18 U.S.C. §§ 2314-15, as the predicate acts of racketeering activity.

The NSPA makes it a federal criminal offense for anyone to transport stolen, converted, or fraudulently obtained money in interstate or foreign commerce while knowing of the theft. 18 U.S.C. § 2314.[20] Additionally, it is unlawful, under the NSPA, to receive money of the value of $5,000 or more, which are a part of interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken. 18 U.S.C. § 2315.[21] According to Plaintiffs, Defendant Monsanto (1) intentionally stole money from Plaintiffs by overcharging and causing its licensees to overcharge Plaintiffs for GM soybean and corn seeds containing Monsanto's gene technology; (2) engaged in a systematic, ongoing course of conduct with the goal and intent to steal or covert money from Plaintiffs; and (3) transmitted these stolen funds in interstate commerce over the course of several years in amounts that exceeded $5,000, in violation of NSPA. In support of its motion to dismiss, Defendant Monsanto argues that Plaintiffs' allegations amount to violations of antitrust laws, which are not racketeering activity under RICO. The Court must determine, therefore, whether Plaintiffs have sufficiently alleged Defendant

---

[20] 18 U.S.C. § 2314, in relevant part, provides: "Whoever transports, transmits or transfers in interstate or foreign commerce any ... money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;... Shall be fined under this title or imprisoned not more than ten years or both...."

[21] 18 U.S.C. § 2315, in relevant part, provides: "Whoever receives ... money of the value of $5,000 or more, ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taking, knowing the same to have been stolen, unlawfully converted, or taken; ... Shall be fined under this title or imprisoned not more than ten years, or both...."

Monsanto knowingly stole, converted, or fraudulently took money from Plaintiffs, within the meaning of the NSPA.

The Court finds unpersuasive Plaintiffs' argument that Congress intended the NSPA to encompass Defendants' alleged conduct. The courts have traditionally exercised restraint in assessing the reach of a federal criminal statute. "We must pay close heed to language, legislative history, and purpose in order to strictly determine the scope of the conduct the enactment forbids." *Dowling v. United States*, 473 U.S. 207, 213 (1985). In *Dowling*, the Supreme Court held that § 2314 could not provide the basis for a prosecution stemming from the interstate transportation of copyrighted material. *Id.* at 216. The Court reasoned that the language of § 2314 clearly contemplated the theft of some tangible item in the channels of interstate commerce and intangible intellectual property did not fall within the Act's ambit. *Id.*

In reaching its decision, the Court also examined the history of the Act. *Id.* at 218. The purpose of the enactment of § 2314 was to aid the States in detection and punishment of criminals who evade state authorities by using channels of interstate commerce. *Id.* at 219. Section § 2314 makes "unlawful the interstate transportation of stolen vehicles, thereby filling in the enforcement gap by striking down State lines which serve as barriers to protect these interstate criminals from justice." *Id.* (internal citations and quotations omitted). Because Congress has exclusive power over the area of copyrights, whether or not interstate commerce was involved, the Court in *Dowling* stated that it would be "implausible to suppose that Congress intended to combat the problem of copyright infringement" when it passed § 2314. *Id*. at 220-21. Here, the purpose underlying § 2314 likewise leads the Court to conclude, absent some indication in the statute itself or the legislative history, that Congress did not intend alleged overcharges, described

as anticompetitive conduct under antitrust laws, to form the basis of a claim that money was stolen, converted or fraudulently obtained in interstate commerce, in violation of the NSPA. The term "stolen," under the NSPA, "denotes any dishonest transaction whereby one person obtains that which rightfully belongs to another." *Lyda v. United States*, 279 F.2d 461, 464 (5th Cir. 1960). In *Lyda*, the Fifth Circuit explained:

> Congress by the use of broad terms was trying to make clear that if a person was deprived of his property by unlawful means amounting to a forcible taking or taking without his permission, by false pretense, by fraud, by swindling, or by a conversion by one rightfully in possession, the subsequent transportation of such goods in interstate commerce was prohibited as a crime.

*Id.*; *see also Isaacs v. United States*, 301 F.2d 706, 713 (8th Cir. 1962) ("fraud [under § 2314] comprises all acts, conduct, omissions, and concealment involving breach of a legal or equitable duty and resulting in damage to another.").

The Court's research reveals that cases reviewing the NSPA typically involve factual circumstances where the accused engages in transactions involving a criminal appropriation of money or property, particularly including misrepresentations, fraud, false pretenses and any other form of guile. *See e.g.*, *McElroy v. United States*, 455 U.S. 642 (1982) (petitioner who used interstate channels to pass his forged checks, subject to punishment under § 2314); *Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288 (S.D. Fla. 2005) (in violation of the NSPA, corporation purposefully inflated the amount it charged for hospital services knowing that the charges did not reasonably reflect actual costs); *United States v. Stillwell*, 854 F.2d 1045 (7th Cir. 1988) (court affirmed defendant's conviction, under § 2315, for stealing a trailer load of steel shelving); *U.S. v. Reid*, 586 F.2d 393 (5th Cir. 1978) (defendant transported stolen stock certificates in interstate commerce, in violation of § 2314). The allegations Plaintiffs make that

Defendants engaged in a "dishonest" transaction or stole money, within the meaning under NSPA, do not rise to the level allowing recovery under RICO and their claims must fail.

Moreover, after a careful reading of the complaint, it is the Court's opinion that Plaintiffs have attempted to reformulate alleged antitrust claims under the label of a violation of the NSPA, in order to state a violation of RICO. Plaintiffs have maintained, throughout this case, that the technology fees they paid for GM seeds were an illegal overcharge attributable to Defendants' alleged antitrust violations, specifically, monopolization and price fixing. Defendants argue persuasively, that the allegations of a violation of the NSPA are patently derivative of alleged antitrust violations, without which there could be no proceeds to steal in interstate commerce. These allegations are directly dependent upon the antitrust claims and would not otherwise stand alone. As Plaintiffs recognize in their brief, courts have held that violations of antitrust laws are not predicate acts under RICO. *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990); *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1083 (N.D. Cal. 2002) ("'racketeering activity' as defined under RICO does not include antitrust violations"). The Plaintiffs have not alleged any other predicate acts under RICO. Therefore, the motion to dismiss Plaintiffs' RICO claims will be granted.

**C.      State Law Claims**

Plaintiffs' state law claims assert causes of action under state antitrust statutes, state unfair and deceptive trade practices statutes and common law unjust enrichment. The 2004 Technology Agreements, which Plaintiffs executed to use Monsanto's patented technology, contain a choice of law provision, which states that "This Agreement and the parties relationship shall be governed

by the laws of the state of Missouri and the United States (other than the choice of law rules)."[22] Defendants assert that Plaintiffs' state law claims are subject to the choice of law provision and accordingly, Missouri law applies. Conversely, Plaintiffs assert that the choice of law provision in the Technology Agreement does not govern because the state law claims are unrelated to the Technology Agreement and do not require an examination or consideration of the Agreement for resolution. Before reaching the merits, the Court must, therefore, determine whether the choice of law provision, in the Technology Agreement, applies to Plaintiffs' state law claims.

In *Baugardner*, this Court ascertained the intention of the parties to determine the subject matter and purpose of the Technology Agreement. The Court found that the Agreement: (1) governs the relationship between Monsanto, the owner of the patented technology, and the grower, the party receiving permission to use said technology; (2) was entered into for the purpose of purchasing and using the patented technology; and (3) performs the function of granting the requested permission to use the patented technology and setting forth the conditions under which that technology may be used. *Baugardner*, at 11-12. Here, after considering the subject matter and purpose for which the parties entered into the Technology Agreement, the Court finds that the choice of law provision does not encompass the state law claims at issue.

Most authority, interpreting whether a reluctant party will be bound by an executed contract containing a "choice of law" provision, discuss, in tandem, "forum selection" clauses, which address far different issues. A party may be willing to agree to appear in a particular forum as opposed to one that might be more convenient, but not if doing so would require

---

[22] Plaintiffs' state court actions were filed in 2004; therefore, the Court's analysis is properly focused on the text of the 2004 Technology Agreement.

relinquishment of all substantive rights, particularly rights pertaining to issues never envisioned when the contract was signed, without fair notice as to the laws that would apply. Of course, the parties can agree to be bound by a choice of law clause if they incorporate specific language. The focus should necessarily be on the scope of the particular clause being debated. The choice of law clause here speaks, "This Agreement and the parties' relationship shall be governed by the laws of the state of Missouri . . ." Certainly, it does not generally mention tort actions, antitrust claims, or R.I.C.O. causes of action. The specific issue here does not involve validity, interpretation or construction of an agreement. Defendants ask the Court to apply Missouri antitrust law against Plaintiffs coming from thirteen states, in some cases to the detriment of Plaintiffs. Under the facts of this case, the choice of law language fails to give Plaintiffs fair warning that they could be compelled to come here, abandoning all of the rights guaranteed to them by their respective states, over issues never envisioned when the contract was signed. See *Britelink, Inc., v. Telecorp PCS, Inc.*, 2004 U.S. Dist. LEXIS 29683, No. 3:03-CV-00207, at *9 n.3 (E.D. Ark., May 7, 2004).

The Court concludes that the claims do not ultimately depend on the existence of the Agreement. Additionally, the claims do not require an interpretation of the Agreement and the factual allegations relevant to the claims are much broader than those relevant to a breach of contract action under the Agreement. Furthermore, Plaintiffs' stated antitrust claims and factual allegations center around the license agreements between Monsanto, Pioneer and DuPont. Plaintiffs charge that pursuant to the license agreements, Monsanto, DuPont and Pioneer conspired to fix, control or maintain the price of GM seeds, in violation of state antitrust laws. To prove these allegations, Plaintiffs will look to the conduct of Defendants; conduct that is not

dependent on the Technology Agreement. Further, Defendants DuPont and Pioneer are not parties to the Technology Agreements; therefore the claims against them cannot depend on the existence of the Agreement. Finally, Plaintiffs' state law claims involve much more than the circumstances surrounding Plaintiffs' use of the patented technology, and therefore, do not involve the same operative facts as a parallel claim for breach of contract. Thus, while some of Plaintiffs' allegations may relate to the Technology Agreement, the Court concludes that Plaintiffs' state law claims exceed the scope of the choice of law provision in the Technology Agreement. Accordingly, the Court declines Defendants' invitation to only apply Missouri law to Plaintiffs' claims for violations of state antitrust statutes, state deceptive trade statutes and common law unjust enrichment.

1. Illinois Antitrust Act and Common Law Unjust Enrichment

Plaintiffs' amended complaint alleges violations of the Illinois Antitrust Act, 740 Ill. Comp. Stat. Ann. 10/3 (2007). Defendants argue that Plaintiffs' state antitrust claims are dependent upon the same allegations supporting their federal antitrust claims, and thus suffer from the same flaws that preclude Plaintiffs from stating a federal antitrust claim.

The Court has determined that Plaintiffs' complaint adequately alleges violations of federal antitrust laws, at this motion to dismiss stage. Thus, the Court likewise concludes that Plaintiffs have adequately alleged claims against Defendants for price-fixing and monopolization, in violation of Illinois antitrust law. *See Baker v. Jewel Food Stores, Inc.*, 823 N.E.2d 93, 101 (Ill. App. Ct. 2005) ("Illinois court can ... use federal case law interpreting section 1 of the Sherman Act as a guide in determining section 3(1).... However, we are not required to follow federal antitrust decisions, although we may do so if we find them persuasive"). Accordingly, Plaintiffs'

Illinois antitrust claims survive Defendants' motion to dismiss as direct purchasers.[23]

The complaint also alleges unjust enrichment, in violation of Illinois law. Defendants first argue that Plaintiffs' unjust enrichment claims are merely antitrust claims in disguise and must be dismissed because they are subject to the Illinois Antitrust Act's indirect purchaser bar. Defendants next argue that, under Illinois law, unjust enrichment is a quasi-contractual theory that is not available when a contract governs the relationship between the parties. Defendants claim that an express contract controls the relationship between the parties and therefore, Plaintiffs' unjust enrichment claims must be dismissed.

The Court first observes that Plaintiffs' common law claims for unjust enrichment are different that the allegations and proof of the elements necessary for its antitrust claims. "Unjust enrichment involves the unjust retention of a benefit by one person to the detriment of another." *Univ. of Ill. v. Continental Cas. Co.*, 599 N.E.2d 1338, 1347 (Ill. App. Ct. 1992) (citing *Knapp v. McCoy*, 548 F. Supp. 1115, 1118 (N.D. Ill. 1982)). "The doctrine of unjust enrichment is used to create an implied contract." *Id.* "The courts will not imply a contract where there exists an express contract between the parties on the same subject matter." *Continental Cas. Co.*, 599 N.E.2d at 1347. "To state a cause of action based on a theory of unjust enrichment, a plaintiff

---

[23] Defendants advance the same argument made here, in support of its Motion to Dismiss Plaintiffs' state antitrust claims under the laws of Indiana, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee and Wisconsin. For the reasons articulated in its analysis of Plaintiffs' claims under the Illinois Antitrust Act, the Court will also deny Defendants' motion to dismiss Plaintiffs' antitrust claims under the states listed above except to the extent they claim that they are indirect purchasers. It should be noted that certain states (Iowa, Kansas, Michigan, Minnesota, Nebraska, North Dakota, South Dakota, Tennessee and Wisconsin) do not preclude state antitrust claims alleged by indirect purchasers and, therefore, the Court's analysis regarding the indirect purchaser bar, does not apply to those states.

must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1998).   In support of its unjust enrichment claims, Plaintiffs allege that Defendants have retained a benefit from Plaintiffs, to the Plaintiffs' detriment.  The Court believes that such allegations are sufficient to assert an unjust enrichment claim.

Furthermore, the Court has determined that while the Technology Agreement relates to Plaintiffs' state law claims, the subject matter of those claims is broader than that contemplated by the Technology Agreement.  The Court further noted that Defendants Pioneer and DuPont are not parties to the Technology Agreement.  The Court thus concludes that, for purposes of Plaintiffs' unjust enrichment claims against Defendants, there is no express contract between the parties covering the subject matter at issue.  The Court will therefore deny Defendants' motion to dismiss with respect to these claims.[24]

2. Indiana Deceptive Consumer Sales Act

Indiana's "Deceptive Consumer Sales Act provides for two kinds of actionable deceptive acts: uncured deceptive acts and incurable deceptive acts." *Lehman v. Shroyer*, 721 N.E.2d 365, 367 (Ind. Ct. App. 1999).[25]  An incurable deceptive act is an "act done by a supplier as part of a

---

[24] In support of its Motion to Dismiss Plaintiffs' unjust enrichment claims, under the laws of Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee and Wisconsin, Defendants advance the same arguments made here.  For the reasons expressed in its analysis of Plaintiffs' unjust enrichment claim under Illinois law, the Court will also deny Defendants' motion with respect to the common law unjust enrichment claims listed above.

[25] In its opposition to Defendants' Motion to Dismiss, Plaintiffs claim that Defendants' alleged deceptive acts were "incurable."  Thus, the Court will limit its analysis to incurable acts

scheme, artifice, or device with intent to defraud or mislead." *See* Ind. Code Ann. § 24-5-0.5-2(a)(8). "Such an act may be committed where the facts evince an intent to mislead. That is misleading which 'tends to lead astray or into error; to guide wrongly.'" *McCormick Piano & Organ Co. v. Geiger*, 412 N.E.2d 842, 849 (Ind. Ct. App. 1980).

Plaintiffs' complaint charges that Defendants committed an incurable deceptive act by "disseminating untrue, incomplete, or otherwise misleading statements and engaging in conduct likely to deceive consumers." Pls.' Compl. at ¶ 585. Specifically, Defendants allegedly used pricing sheets, price advisories, price lists and postings of prices generated by Defendants, to give the impression that they were selling GM soybean and corn seeds at competitive prices, when in fact they were selling the seeds at artificially high and supracompetitive prices. *Id*. The complaint alleges that Defendants committed the alleged incurable deceptive act in violation of § 24-5-0.5-3(a)(6), which prohibits "representations ... made either orally or in writing... that a specific price advantage exists..., if it does not and if the supplier knows or should reasonably know that it does not."

In support of its motion to dismiss, Defendants correctly cite to *Berghausen v. Microsoft Corp.*, 765 N.E.2d 592, 598 (Ind. Ct. App. 2002), for the proposition that alleged implicit representations of a specific price advantage, do not state a claim under § 24-5-0.5-3(a)(6). Plaintiffs' claim, that Defendants' pricing procedures "gave the impression" that the GM seeds were being priced competitively, is insufficient to allege that Defendants' made oral or written representations regarding a specific price advantage with respect to the GM seeds. Furthermore, Plaintiffs have not sufficiently alleged that they were "lead astray or into error" or guided

under the statute.

wrongly, within the meaning of the statute. The Court thus concludes that Plaintiffs have failed to adequately allege a violation of Indiana's Deceptive Consumer Sales Act and will grant Defendants' motion to dismiss this claim.

### 3. Kansas Consumer Protection Act

Plaintiffs allege that Defendants published pricing sheets, price advisories, price lists and the posting of prices, failed to disclose that GM seeds were being sold at artificially high and supracompetitive prices and that Defendants were fixing the price of the seeds in question. Plaintiffs claim that Defendants therefore engaged in one or more "deceptive acts or practices," in violation of the Kansas Consumer Protection Act ("KCPA"), Kan. Stat. Ann. § 50-626(b)(2) and (b)(3). The KCPA provides that deceptive acts include, among other things, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material facts," *id*. at § 50-626 (b)(2), and "the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact," *id*. at § 50-626(b)(3).

Plaintiffs also contend that Defendants' alleged conduct was an unconscionable act, in violation of Kan. Stat. Ann. § 50-627. Section 50-627 provides that "no supplier shall engage in any unconscionable act or practice in connection with a consumer transaction...." § 50-627(a). Plaintiffs allege that Defendants' actions were unconscionable because Defendants induced Plaintiffs to enter into a transaction that was excessively onesided in favor of the supplier. *See* § 50-627(b)(5) ("the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier.").

The Court finds that Plaintiffs' claims under the KCPA lack merit. The Court has already determined, in the context of Plaintiffs' claims under the Indiana Deceptive Consumer Sales Act,

that Plaintiffs have not sufficiently alleged that Defendants made any oral or written misrepresentation with respect to the pricing of the GM seeds at issue. Thus, Plaintiffs' claims under § 50-626(b)(2) must fail. Additionally, in *Heller v. Martin*, 782 P.2d 1241, 1244 (Kan. 1989), the Kansas Court of Appeals instructed that § 50-626(b)(3) "does not proscribe mere nondisclosure of a material fact." Accordingly, Plaintiffs' allegation that Defendants failed to disclose that the GM seeds were being sold at artificially high and supracompetitive prices cannot state a claim under the KCPA.

Finally, the Court finds that Plaintiffs have not adequately plead an unconscionable practice, in violation of the KCPA. The comment to § 50-627(b)(5) explains that conduct under this subsection includes "requiring a consumer to sign a one-sided adhesion contract which is loaded too heavily in favor of the supplier, even though some or all of the contract terms are lawful in and of themselves." In *Wille v. Southwestern Bell. Tel. Co.*, 549 P.2d 903 (1976), the Kansas Supreme Court stated that purpose of the doctrine as follows:

> The doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequence *per se* of uneven bargaining power or even a simple old-fashioned bad bargain.

*Id*. at 907. Plaintiffs' allegation that Defendants failed to disclose that they were selling seeds at supracompetitive, rather than competitive prices does not, in the Court's view, rise to the level of an "oppressive and unfairly surprising contract." *See id*. at 906 (internal citations and quotations omitted) ("Most often contracts involving unfair surprise involve a party whose circumstances, perhaps his inexperience or ignorance, when compared with the circumstances of the other party, makes his knowing assent to the fine print terms fictional."). Thus, as a matter of law, Plaintiffs

have not adequately alleged that Defendants violated the unconscionability provision of the KCPA. *See Waggener v. Seever Systems, Inc.*, 664 P.2d 813, 819 (1983) (whether act is unconscionable is a question for the court).

Moreover, the Court agrees with Defendants' argument that Plaintiffs have attempted to reformulate their antitrust claims to state a claim under the KCPA. In *Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304, 307 (Kan. 1988), the Kansas Supreme Court observed that acts relating to agreements, monopolies, trusts, conspiracies or combinations in restraint of trade, do not fall within the practices prohibited by the KCPA. Therefore, Defendants' motion to dismiss the Kansas consumer protection claims will be granted.

    5.  <u>Minnesota Uniform Deceptive Trade Practices Act and Prevention of Consumer Fraud Act</u>

Plaintiffs claim that Defendants' alleged practice of selling the GM seeds at supracompetitive - rather than competitive - prices, violated Minnesota's Prevention of Consumer Fraud Act ("PCFA") and created a likelihood of confusion or misunderstanding, in violation of the Minnesota Uniform Deceptive Trade Practices Act ("UDTPA").

The UDTPA lists twelve practices which constitute "deceptive trade practices" and a thirteenth category which provides that: " a person engages in a deceptive trade practice when in the course of business, vocation or occupation, the person: engages in any other conduct which similarly [to the twelve enumerated deceptive trade practices] creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44 subd. 1(13).

The PCFA prohibits "the act, use or employment of any fraud, false pretense, false promise, misrepresentations, misleading statement, or deceptive practice with the intent that

others rely thereon in connection with the sale of any merchandise...." Minn. Stat. § 325F.69 subd. 1.

*In re New Motor Vehicles Canadian Exp. Antitrust Litig*., 350 F. Supp.2d 160, 190 (D.Me. 2004), the court, citing to *Lerfald v. Gen. Motors Corp*., 03-003327 (Minn. Dist. Ct. Nov. 7, 2003), determined that the plaintiff's allegations, that defendant dealers charged inflated prices for motor vehicles, failed to state a claim under the UDTPA and the PCFA. In the Minnesota case, the plaintiffs contended that it was deceptive to state a price for a car while knowing that the conspiracy maintained prices at an artificially high level. *Id*. The judge in the Minnesota case, rejected that argument as "'neither logical or rational.'" *Id*.

Here, the Court also believes that Plaintiffs have failed to state a claim under the UDTPA and the PCFA. Plaintiffs have failed to set forth any allegations showing that there was a likelihood of confusion or misunderstanding, with respect to the purchase of the GM seeds, within the meaning of the UDTPA. Likewise, Plaintiffs have not adequately alleged any use of fraud, misrepresentation or deceptive practices on the part of Defendants, within the meaning of the PCFA. *See Alsides v. Brown Inst., Ltd.*, 592 N.W.2d, 468, 474 (Minn. Ct. App. 1999) ("To sustain a claim for consumer fraud, a plaintiff must demonstrate that the defendant made a false promise or misrepresentation"). Therefore, Defendants' motion to dismiss the Minnesota consumer protection claims will be granted.

6. Nebraska Uniform Deceptive Trade Practices Act[26]

Nebraska's Uniform Deceptive Trade Practices Act enumerates fourteen practices which

---

[26] In their Motion to Dismiss, Defendants did not address Plaintiff's claims under the Nebraska Consumer Protection Act, Neb. Rev. Stat. §59-1601 *et seq* (2007). Therefore, the Court will not analyze Plaintiff's claims under this statute.

constitute a deceptive trade practice within the meaning of the statute. *See* Neb. Rev. Stat. § 87-302(a)(1)-(14). Plaintiffs argue that Defendants engaged in unconscionable and deceptive acts in violation of § 87-302. The Court has already determined that Plaintiffs have not alleged any unconscionable conduct or deceptive acts on the part of Defendants. Plaintiffs thus cannot satisfy the pleading requirement with respect to their deceptive trade practice claim. In light of the Court's ruling, it is not necessary to address the parties dispute concerning whether the commercial transactions at issue here fall within the ambit of the statute. Thus, Defendants' motion to dismiss Plaintiffs' Nebraska deceptive trade practice claims will be granted.

    7. North Dakota Consumer Fraud Act

    North Dakota's Consumer Fraud Act prohibits "the act, use or employment of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. Cent. Code. § 51-15-02. Given the language of the statue, the Court concludes that Plaintiffs must allege fraudulent or deceptive conduct to maintain a North Dakota consumer protection claim. *See State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 905 n.5 (affirming trial court's determination that the conduct at issue in the case was not fraudulent or deceitful, and therefore not violative of § 51-15-02 ). The Court has determined that Plaintiffs have not alleged fraud or deception on the part of Defendants, as required under § 51-15-02. Plaintiffs' reliance on *Jorgenson v. Agway*, Inc., 627 N.W.2d 391 (N.D. 2001), in support of their claim, is misplaced. In that case, the Supreme Court of North Dakota considered whether § 51-15-02 applied to consumer transactions, not whether the plaintiff properly pleaded fraud or deceit under the statute. Moreover, the farmers in *Jorgenson* alleged that the seller made misrepresentations

46

with respect to its product's benefits, an issue not relevant in this case.  Accordingly, the North Dakota consumer protection claims will be dismissed.

       8. <u>South Dakota Deceptive Trade Practices and Consumer Protection Act</u>

       South Dakota's Deceptive Trade Practices and Consumer Protection Act ("DTPCPA"), S.D. Codified Laws § 37-24-6, enumerates conduct which constitutes a prohibited act or practice. The applicable provision states that it is a deceptive act or practice to "knowingly and intentionally act, use or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise."  S.D. Codified Laws § 37-24-6 (1); *See Nw. Pub. Serv. v. Union Carbide Corp.*, 236 F. Supp. 2d 966, 973-74 (D.S.D. 2002) (claims under § 37-24-6, "require proof of an intentional misrepresentation or concealment of a fact on which plaintiff relied and that caused injury to the plaintiff").   The Court has already determined that Plaintiffs have not alleged intentional misrepresentation or concealment on the part of Defendants.  Thus, Plaintiffs' claims under § 37-24-6 must be dismissed.

**D.**    **Injunctive Relief**

       Defendants argue that Plaintiffs' equitable claims should be dismissed because Plaintiffs failed to allege irreparable harm and lack of an adequate remedy at law.  Permanent injunctive relief is available for private plaintiffs under § 16 of the Clayton Act, 15 U.S.C. § 26.[27]  The

---

    [27] 15 U.S.C. § 26 in relevant part, provides: "Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation fo the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, ... and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue...."

Eighth Circuit Court of Appeals in *Rosebrough Monument Co. v. Memorial Park Cemetery Asso.*, explained that "in the injunction context, once a determination has been made that the defendant has violated antitrust laws," a plaintiff must demonstrate a threatened loss or damage, in violation of § 26.  666 F.2d 1130, 1147 (8th Cir. 1981).  To demonstrate it is entitled to injunctive relief, Plaintiffs must show that Defendants' actual or threatened conduct: (1) will violate the antitrust laws; (2) proximately causes, or if implemented would cause, a loss or injury; (3) is of the type the antitrust laws were designed to prevent and (4) is cognizable in equity. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110-12 (1986).  Because the Court has not determined, at this juncture, whether Defendants have violated the antitrust laws, a ruling cannot be made as to whether injunctive relief is appropriate.

Defendants also argue that Plaintiffs lack standing to assert a claim for injunctive relief. Injunctive antitrust standing requires that the plaintiff demonstrate "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26;  *Cargill*, 479 U.S. at 111.  The Court believes Plaintiffs have sufficiently alleged a threat of loss or damage by Defendants' alleged violation of the antitrust laws.  Plaintiffs' contention, that they paid an increased price for the GM seeds at issue as a result of Defendants' anticompetitive conduct, Pls.' Compl. at ¶ 86, adequately alleges the requisite "threatened loss or damage," to seek injunctive relief under antitrust laws. *See Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998) (consumers who paid additional service fees to monopolist supplier had antitrust standing to seek injunctive relief under Clayton Act).   In sum, Plaintiffs have not established that Defendants violated the antitrust laws and therefore the Court cannot, at this time, determine whether injunctive relief is appropriate. However, the Court concludes that Plaintiffs have standing to seek injunctive relief.  Thus,

Defendants' motion to dismiss Plaintiffs' injunctive relief claims will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [doc. #138] is **GRANTED, in part and DENIED, in part.** Counts 1-4, alleging violations of RICO, are dismissed. Counts 31, 35, 45, 49, 59, 60, 64, 65, 77, 81, 82, 83, 87, 91, 101 and 105, alleging violations of state unfair and deceptive trade practices statutes and consumer protection statues as defined by those terms and other terms unique to these counts are dismissed. All claims of Plaintiffs, as indirect purchasers of either germplasm or any genetic trait associated therewith, except the state law claims from Iowa, Kansas, Michigan, Minnesota, Nebraska, North Dakota, South Dakota, Tennessee and Wisconsin are dismissed for lack of standing.

**IT IS FURTHER ORDERED** that a Telephone Motion Hearing on Plaintiffs' Motion for Relief/Motion to Enjoin State Court Proceedings [doc. #174] will be held on **October 3, 2007**, at **9:00 a.m.** Counsel for all interested parties shall notify chambers of the identity of counsel to participate in this hearing prior to the hearing date. The Court will initiate this telephone hearing with identified counsel on the date and time stated above.

So Ordered this 20th Day of September, 2007.

E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE